

### *State of New Jersey*
OFFICE OF THE ATTORNEY GENERAL
DEPARTMENT OF LAW AND PUBLIC SAFETY
OFFICE OF THE SOLICITOR GENERAL
PO BOX 080
TRENTON, NJ 08625-0080

**MIKIE SHERRILL**
*Governor*

**DR. DALE G. CALDWELL**
*Lt. Governor*

**JENNIFER DAVENPORT**
*Attorney General*

**JEREMY M. FEIGENBAUM**
*Solicitor General*

March 2, 2026

**<u>VIA ECF</u>**

Catherine O'Hagan Wolfe, Clerk of Court
United States Court of Appeals for the Second Circuit
Thurgood Marshall United States Courthouse
40 Foley Square
New York, New York 10007

> Re: ***New Jersey et al. v. United States Department of Transportation***, No. 26-282, FRAP 28(j) Letter

Dear Ms. Wolfe:

The States write to apprise the motions panel of intervening factual developments.

First, developments before the district court refute DOT's argument that the "entire focus since the issuance of the district court's order has been to obtain specific contractual performance—paying out funds." Reply.7. Since that date, the court again confirmed her TRO is exclusively "an invalidation of the suspension order, there was no order for [DOT] to actually disburse funds or disburse funds on a particular schedule … because it would not be appropriate to do so in an APA action." Ex.1 at 7:11-21; *id.* at 9:25-10:21. And the States confirmed they seek only that DOT "will not withhold any reimbursements to GDC *based on the September 30 suspension policy*," Ex.2 (emphasis added)—an APA remedy.



Second, subsequent developments have impacted DOT's assertion of "immediate" irreparable harm. Reply.9. DOT cites its "interest in avoiding the irreversible disbursement of federal funds under an order entered by a court lacking jurisdiction." Reply.10. But DOT already disbursed the "$205 million worth of reimbursement requests" cited in its motion, Motion.22, and the next disbursement deadline to which its September 30 suspension policy could even apply is April 1, *see* Ex.3—weeks *after* the March 12 date on which the Court of Federal Claims will separately decide whether DOT's withholding of funds breaches its independent contractual obligations to GDC. And in the States' case, the district court has set a consolidated PI hearing and trial on the merits for April 16.

Finally, DOT's recent conduct undermines its own arguments that its harm (should any persist) is irreparable. Unlike a case where the Federal Government represents its funds "cannot be recouped and are thus irrevocably expended," *NIH v. Am. Pub. Health Ass'n*, 145 S.Ct. 2658, 2659 (2025), DOT has repeatedly before the Claims Court *refused* to foreswear the agency's ability to clawback the funds—even withdrawing a motion the Claims Court judge had explicitly agreed to grant if only DOT would make such a representation.

Respectfully submitted,

JENNIFER DAVENPORT
*Attorney General of New Jersey*

By:  /s/ Jeremy M. Feigenbaum
JEREMY M. FEIGENBAUM
*Solicitor General*
Office of the Attorney General
25 Market Street
Trenton, NJ 08625
(862) 350-5800
Jeremy.Feigenbaum@njoag.gov

Word Count: 330
cc:  All counsel (via ECF)



# Exhibit 1

Transcript of 2/13/26 Hearing in *New Jersey et al. v. Department of Transportation*, No. 26-cv-939 (S.D.N.Y)

1

Q1DRSTAc

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   STATE OF NEW JERSEY, ET AL.,

 4                  Plaintiffs,

 5          v.                              26 Civ. 939 (JAV)

 6   UNITED STATES DEPARTMENT OF
     TRANSPORTATION, ET AL.,
 7                                          Remote Conference

 8                  Defendants.

 9   ------------------------------x
                                            New York, N.Y.
10                                          February 13, 2026
                                            3:00 p.m.
11
     Before:
12
                        HON. JEANNETTE A. VARGAS,
13
                                            District Judge
14
                              APPEARANCES
15
     NYS OFFICE OF THE ATTORNEY GENERAL
16        Attorneys for Plaintiffs
     BY:  RABIA MUQADDAM
17        JEREMY FEIGENBAUM
          SHANKAR DURAISWAMY
18        STEPHEN THOMPSON

19   JAY CLAYTON
          United States Attorney for the
20        Southern District of New York
     BY:  CHIBOGU NNEKA NZEKWU
21        TARA SCHWARTZ
          Assistant United States Attorneys
22

23

24

25
```

Q1DRSTAc

1        (Case called; appearances noted)

2        THE COURT:  So I called this conference in response to

3    the letter motion that I received from plaintiffs.  Plaintiffs,

4    let me have you combine and explain what is the current state

5    of play.

6        MS. MUQADDAM:  Thank you, your Honor.  So I apologize

7    for the late request, but we've learned a couple things in the

8    last few hours that have us particularly concerned about

9    compliance with the TRO.  The first is that we learned from

10   defendants that, despite our understanding on Monday that they

11   were about disperse the money, that was their assertion as the

12   basis for irreparable harm, that there are a number of

13   processes that apparently now need to occur.  We understand

14   that there are administrative processes that need to occur, but

15   we're not sure how they could not have already happened before

16   1 p.m. on Monday.

17       And then the second thing that we've learned today is

18   that requests that were made to FTA for monies to enter the

19   ecosystem —— this is what I believe is where the $205 million

20   is to come from —— that the requests that were put ITVC

21   earlier this week were canceled without any notice to GDC, so

22   as a result, we are looking for information.  If defendants can

23   let us know what the process is, when the money is going to

24   come, how to square this with their representation on Monday,

25   that's why we've sought the conference.

Q1DRSTAc

```
 1          THE COURT:  Let me hear from the government.  What is
 2    the current timing for the disbursement?
 3          MS. NZEKWU:  Your Honor, first I would say that we
 4    have been in constant contact with them and provided
 5    information to them personally.  Our agency is working hard for
 6    the disbursement.  I would like to first address Rabia's
 7    statement about -- which implies that we put forth some
 8    misguided truth or misrepresented ourselves as about Tuesday.
 9    When we requested our stay, we were in the process of making
10    our payments, of going through the payment process.  So that
11    was just a multi-step process, and we discussed that.  When we
12    requested our TRO, we did that because we were actively in the
13    process.  If the process continued, the money would have been
14    disbursed as per the --
15          THE COURT:  Would the funds have been dispersed at
16    1 p.m. on Monday?
17          MS. NZEKWU:  I don't believe all of them would have
18    been dispersed, your Honor.  Some of them would have been
19    disbursed because of where we were in the procedure, but those
20    ones are still ongoing.  For example, the loan disbursements
21    totaling about $30 million, they have been processed, and they
22    will be sent to Treasury this afternoon.  Our agencies are
23    telling us that those payments, we believe, should be received
24    this afternoon.  That's $30 million there.
25          There are some that are still pending that we may be
```

Q1DRSTAc

```
 1   held until — Because of the holiday weekend —— possibly
 2   Tuesday.  To address plaintiff's concern about the cancellation
 3   of the request, on February 9, those requests were canceled
 4   because of the TRO that was in place.  If those requests were
 5   not canceled, the funds would have been allocated and the funds
 6   would have been disbursed.  That is why they were canceled.
 7   We're now going through the process again to get the funds we
 8   redistributed.
 9           THE COURT:  All right.  So let me make sure I
10   understand where things currently stand.  We have approximately
11   $30 million of what I believe you said were loan
12   reimbursements, is that correct?
13           MS. NZEKWU:  Loan disbursements, yes.
14           THE COURT:  Loan disbursements.  And those are
15   scheduled to be released imminently this afternoon.  It says by
16   10 p.m., but I assume by 5 p.m. close of business today, they
17   are scheduled to be released.  Is that your understanding?
18           MS. NZEKWU:  I'm not sure about close of business
19   today, but I know they'll be sent to Treasury this afternoon.
20   The agency believes that there will be --
21           MS. SCHWARTZ:  Nneka, could I -- your Honor, could I
22   just jump in to clarify something?
23           THE COURT:  Yes.
24           MS. SCHWARTZ:  What we understand -- and, Nneka, you
25   can correct me if I got this wrong, but I just want to make
```

Q1DRSTAc

1    sure we get this right.  I apologize, your Honor, we're getting

2    information from the agency in real time, so keeping track of

3    all of this has been a little bit difficult.  But the agency

4    has to send all of the requests, all of the payments go to

5    Treasury first.  And so there are payments that --

6    reimbursement requests that the agency has approved and has

7    sent to Treasury already, but Treasury now has to process them

8    and that could take up to a business day.  And given that it's

9    a holiday weekend, it's possible that plaintiffs don't get that

10    money until Tuesday.  But the DOT has done everything it can to

11    process those requests.  Those are just now with the Treasury

12    Department.

13            THE COURT:  And what is Treasury doing to expedite

14    getting those out the door at this point?

15            MS. SCHWARTZ:  Your Honor, we haven't been in touch

16    with the Treasury Department.  I don't know that they are doing

17    anything on their end to expedite the requests.  Our

18    understanding of the TRO was that it required the Department of

19    Transportation to lift the suspension of payments to the GDC,

20    and it did that immediately once the -- once the TRO had been

21    lifted, it did that.  I don't recall if it was either last

22    Sunday night or early last Monday morning before the stay was

23    issued.  And it did that again, yesterday around 5 p.m. after

24    the stay that your Honor imposed had expired.

25            However, there are obviously manual processes that

6

Q1DRSTAc

```
1    take place once the suspension is lifted in their system before

2    wires with tens of millions of dollars are sent out.  And it's

3    my understanding that all of the payments pursuant to the

4    various grants, they all have -- you know, some of them are

5    sent through different systems, but they all go through

6    Treasury before the payments actually go out to the GDC.

7               THE COURT:  Right.

8          Do we have any idea of, in a normal processing state,

9    how long does it normally take once a payment is released from

10   DOT to Treasury for it then to be released to GDC?

11              MS. SCHWARTZ:  We understand that it usually occurs

12   the next business day.  So in this case, that -- you know,

13   given that --

14              THE COURT:  It would be Tuesday then?

15              MS. SCHWARTZ:  It would be Tuesday, yeah.

16              THE COURT:  And that would be for the payments that

17   DOT has released, which you said some had already been released

18   from DOT to treasury, and that by end of today, there's another

19   $30 million in loan disbursements that will also go from

20   treasury to DOT, or is the $30 million what we're already

21   talking about and there's additional money in process?

22              MS. SCHWARTZ:  Nneka, correct me if you think I'm

23   wrong here, but my understanding is that the DOT has submitted

24   to the Treasury all of the pending RAISE grant requests and all

25   of the pending CIG grant requests.  Plaintiffs might have a
```

Q1DRSTAc

better idea of what that amount is, but I think that was a

significant portion of the $205 million in past due

reimbursement requests.

MS. NZEKWU:  That's correct, Tara.  And I should say

the loan disbursements that I'm referring to, just for clarity,

are under the, I believe, Build America Bureau loans, just to

clarify what we're talking about.

THE COURT:  Thank you.  That's helpful.

All right.  Thank you very much.  That was very

helpful.

Let me hear from plaintiffs.  In light of this, it

does seem as if the defendants are in compliance, or at least

that's what they're representing, that the order that was

entered by the Court, which was basically an invalidation of

the suspension order, there was no order for them to actually

disburse funds or disburse funds on a particular schedule.  The

states made very clear that they were not seeking that relief

because it would not be appropriate to do so in an APA action,

just the lifting of the suspension, and now we're in a world

with the suspension lifted and payments going through the

process that they would normally go through.

MS. MUQADDAM:  Your Honor, I would just say that they

specifically represented that the only thing stopping the

disbursement of the $205 million at 1 p.m. on Monday, and that

was the immediate disbursement, was the absence of the stay

Q1DRSTAc

1 that they sought. They represented that money would flow

2 Monday at that time, and the reason it appears -- at least part

3 of the reason that they have not flowed as quickly as we might

4 have expected following the lifting of the stay at 5 p.m. is

5 DOT's cancellation of the request without any notice to GDC.

6 So we're hoping to get some confirmation or affirmants of the

7 timing.

8            What we've heard from D.O.J. is that the Treasury to

9 GDC process can take up to one to two business days. So what

10 we've heard today doesn't really assuage our concerns that

11 we're not going to get this money in a timely fashion. If the

12 defendants could provide some actual timing about when we might

13 expect it? It's a little strange for us to hear about the

14 $33 million. On Monday, we understood that there would be the

15 $205 million available, and that the administrative processes

16 must have happened. We also have not heard anything about the

17 FRA or RRIF payments, which are -- we've been told simply that

18 there are processes in progress that will result in those

19 monies, but also we have no assurance to those as well.

20            THE COURT: Well, I'll say a few things first, which

21 is, number one, I did hear the government explain about the

22 cancellation of the eco request -- the request of the

23 ecosystem, as I understood it, that they were in the process of

24 disbursing money pursuant to those requests when the Court

25 granted its administrative stay. If those are not cancelled in

Q1DRSTAc

1    the system, at least as the government represents it, the money

2    goes out the door.  So given that there was an administrative

3    stay in effect, there needed to be a cancellation in order

4    prevent the money from then flowing.

5         Now, one could suggest that they should have notified

6    GDC of that action so that GDC was aware of the cancellation.

7    But I also know that there's a lot of moving parts happening

8    this week, and things are happening in fairly short, quick

9    order, so let's put that to the side.

10        I have reviewed the submission that was made to me and

11   to the Circuit with respect to this 1 p.m. representation.  I

12   don't think it is as clear as plaintiffs are suggesting.  One

13   could certainly infer that the government had suggested that if

14   a state was not granted that money would flow at 1 p.m.  I

15   don't think they -- I'm looking at the language right now.  It

16   doesn't say that $205 million is going out the door at 1 p.m.

17   What it says is, unless the Court's order is stayed by 1 p.m.,

18   the government will be forced to disburse up to $200 million.

19   It doesn't necessarily speak to, at 1:05 p.m., all the money in

20   one big bulk is getting paid, which I think is what you are

21   suggesting is what they represented.

22        I can understand why you might have had that

23   impression, but I don't think there was an explicit

24   representation.  And if that's not how funds normally flowed

25   pursuant to the Gateway project, then my order simply says to

Q1DRSTAc

| | |
|---|---|
| 1 | invalidate the suspension. It doesn't order that all past |
| 2 | reimbursements are due by Monday at X time or a schedule. And |
| 3 | that was something that was discussed at the conference, that |
| 4 | that would be an inappropriate order. The only order that can |
| 5 | issue under the APA is to invalidate the administrative action |
| 6 | that has been challenged. And they are representing that that |
| 7 | administrative action, the suspension, is no longer in effect, |
| 8 | and money has flowed from DOT to Treasury and will flow from |
| 9 | Treasury to the GDC. And that that will likely start being |
| 10 | realized by GDC as of Tuesday, and then I'm guessing over the |
| 11 | course of a few days after that, given that there is no court |
| 12 | ordered schedule. |
| 13 | Obviously, it's incumbent upon the government to |
| 14 | ensure that those actions are being taken by DOT in good faith |
| 15 | and that they are, in fact, processing all the payments that |
| 16 | need to be processed now that the suspension is lifted and |
| 17 | following their usual processes to do so. But I don't know |
| 18 | that there's any immediate relief to be granted by this Court |
| 19 | in light of the representations that are being made to me by |
| 20 | the government that they are in compliance currently with the |
| 21 | Court's order. |
| 22 | MS. MUQADDAM: Thank you, your Honor. We are not |
| 23 | seeking affirmative relief. I think the information we learned |
| 24 | today, which we hadn't fully been able to learn, has been very |
| 25 | helpful. I will just say that this is a fact that for sure the |

Q1DRSTAc

government knows better than us, but my understanding is that

without cancellation, many of the requests that have been put

in over time have just been pending in the systems for a long

time.  Perhaps that's for another reason, but we did not

understand the cancellations to be necessary in order to

prevent the money from flowing.  Given our knowledge of the

systems, our understanding was that the cancellation was not

necessary so that was another source of confusion for us.  But

it sounds like we have a representation here that helps us

understand that.

THE COURT:  Can the government speak to that?  Was the

cancellation necessary to prevent funds from actually flowing

while the administrative stay information effect, or could the

entries have remained in the ecosystem?

MS. SCHWARTZ:  I don't think we know the answer to

that at this moment, your Honor.

THE COURT:  Can you, in fact, investigate to see

whether or not those cancellations were necessary to prevent

money from being disbursed?  And if not, why were those steps

taken in light of the pending order, the TRO, which was stayed

but only until Thursday at 5 p.m.?

MS. SCHWARTZ:  Yeah, your Honor, we can definitely

investigate that.  I would say that any harm from the

cancellation of those eco requests has now been remediated

because the GDC has submitted new ones for the CIG and RAISE

Q1DRSTAc

1    grants.  Where the reimbursement requests go through the

2    ecosystem, those have now been sent to the Treasury Department.

3          If I could just respond to one other point that

4    opposing counsel made about the representations that we made on

5    Monday?  The reason why we requested a stay by 1 p.m. is

6    because the Department of Transportation was moving

7    expeditiously to both comply with the Court's order and get

8    payments out the door.  And because there are some manual --

9    there's some mechanisms involved in getting the funds out the

10   door, the Department of Transportation reasonably believed that

11   their employees would and could have done that by 1 p.m. on

12   Monday and had been instructed to do so.

13         And that doesn't mean that the payments -- when I say

14   out the door, I don't mean necessarily would have gone to GDC

15   immediately, but their request for payment would have gone to

16   the Department of Treasury.  And it wasn't clear to the

17   Department of Transportation that they would have a way to claw

18   those requests for payment back from the Department of Treasury

19   before they went to the GDC, so I just wanted to clarify that.

20   We were in no way trying to leave the Court with any

21   misapprehension about what would or could have happened on

22   Monday without the stay.

23         MS. MUQADDAM:  Your Honor, if I could respond?

24         THE COURT:  Yes.

25         MS. MUQADDAM:  I guess I'm having a hard time

understanding how that response squares with the idea that
there needed to be a one to two day period at the Treasury.  If
DOT was concerned about the money at least beginning to go out
at 1 p.m., I guess I don't understand how that could be true if
there were these other steps to go to the Treasury.  But I take
your Honor's point that there it is perhaps not as explicit as
we fear in the statements.  It does say particularly in the
Second Circuit motion, the DOT to immediately expend millions
of dollars it would be unable to recover, so from that we
intuited that the money would go out the door, such that they
couldn't receive it.  But if it was just going to Treasury for
one to two days, we're not sure how -- well, I don't fully
understand the sequence of events.

Then I'll just say, we have not asked your Honor for
substantive relief, but we would perhaps ask, in light of these
affirmations that have happened in this hearing, if defendants
might be ordered to offer a status update or report on Monday
—— not Monday, it's a holiday —— Tuesday.  We would submit that
that might be appropriate.

THE COURT:  I think that is appropriate both for the
Court's benefit and for the parties' benefit.  So I am going to
order the defendants to provide a status report by 3 p.m. on
Tuesday afternoon.  I believe that will be the 17th, if I'm
correct in my calculations.  I often am not.

MS. SCHWARTZ:  Yes, Judge.  It's the 17th.

Q1DRSTAc

```
 1              THE COURT:  Great.  The 17th at 3 p.m. on the docket,

 2    a status report as to the current status of payment

 3    disbursements, both the ones that we've talked about today that

 4    have already gone from DOT to Treasury, where those stand, and

 5    where remaining disbursements stand.

 6              Does the government have any questions about that?

 7              MS. SCHWARTZ:  No, your Honor.

 8              THE COURT:  Any other issues for us to take up today?

 9              MS. MUQADDAM:  Your Honor, I just wanted to confirm

10    that the report will include also the FRA and the RRIF

11    disbursements.  I understand that to be inherent in your order,

12    but the status of those seems to be particularly unknown at the

13    time.

14              THE COURT:  It is the status of all payments, so that

15    would include the FRA and the RRIF.

16              Anything else?

17              MS. MUQADDAM:  I don't believe so, your Honor.

18    Nothing more from plaintiffs.

19              THE COURT:  Anything from the government?

20              MS. SCHWARTZ:  No, your Honor.  Thank you.

21              MS. NZEKWU:  No, your Honor.

22              THE COURT:  All right.  We're adjourned.

23              (Adjourned)

24

25
```

# Exhibit 2

2/25/26 E-mail Exchange Between AUSA Tara Schwartz
and NJ Deputy SG Shankar Duraiswamy

3/1/26, 9:35 AM
RE: Sunday AM - Enjoy the day! - Jake Mazeitis - Outlook

 Outlook

---

## [EXTERNAL] Re: NJ v. DOT Call

**From** Schwartz, Tara (USANYS) <Tara.Schwartz@usdoj.gov>

**Date** Wed 2/25/2026 6:50 PM

**To** Shankar Duraiswamy <Shankar.Duraiswamy@njoag.gov>; Nzekwu, Chibogu (USANYS) <Chibogu.Nzekwu@usdoj.gov>

**Cc** Jeremy Feigenbaum <Jeremy.Feigenbaum@njoag.gov>; Muqaddam, Rabia <rabia.muqaddam@ag.ny.gov>; Stephen.Thompson@ag.ny.gov <stephen.thompson@ag.ny.gov>

---

That's correct.

---

**From:** Shankar Duraiswamy <Shankar.Duraiswamy@njoag.gov>
**Sent:** Wednesday, February 25, 2026 6:43:23 PM
**To:** Schwartz, Tara (USANYS) <Tara.Schwartz@usdoj.gov>; Nzekwu, Chibogu (USANYS) <Chibogu.Nzekwu@usdoj.gov>
**Cc:** Jeremy Feigenbaum <Jeremy.Feigenbaum@njoag.gov>; Muqaddam, Rabia <rabia.muqaddam@ag.ny.gov>; Stephen.Thompson@ag.ny.gov <stephen.thompson@ag.ny.gov>
**Subject:** [EXTERNAL] Re: NJ v. DOT Call

Tara,

I understand from our call just now that Defendants are committing (1) that they will not dispute that the TRO remains in effect until Judge Vargas holds a preliminary injunction hearing, consistent with the language of her order, and (2) they will comply with the TRO while it remains in effect, meaning they will not withhold any reimbursements to GDC based on the September 30 suspension policy, subject to any stay that is entered.

If you confirm these commitments in response to this email, Plaintiffs will stand down for now on asking J. Vargas to adjudicate a summary judgment or preliminary injunction motion before April 1.

Thanks very much.

---

**From:** Schwartz, Tara (USANYS) <Tara.Schwartz@usdoj.gov>
**Sent:** Wednesday, February 25, 2026 12:15:31 PM
**To:** Shankar Duraiswamy <Shankar.Duraiswamy@njoag.gov>; Nzekwu, Chibogu (USANYS) <Chibogu.Nzekwu@usdoj.gov>
**Cc:** Jeremy Feigenbaum <Jeremy.Feigenbaum@njoag.gov>; Muqaddam, Rabia <rabia.muqaddam@ag.ny.gov>; Stephen.Thompson@ag.ny.gov <stephen.thompson@ag.ny.gov>
**Subject:** [EXTERNAL] RE: NJ v. DOT Call

# Exhibit 3

Declaration of Patrick McCoy, ECF No. 24-1, *Gateway Development Commission v. United States*, No. 26-176C (Fed. Cl.)

### IN THE UNITED STATES COURT OF FEDERAL CLAIMS

GATEWAY DEVELOPMENT
COMMISSION,

             Plaintiff,

        v.

THE UNITED STATES,

             Defendant.

No. 26-176C

Judge Richard A. Hertling

### DECLRARATION OF PATRICK J. MCCOY IN SUPPORT OF PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO AMEND THE SCHEDULE AS TO PLAINTIFF'S MOTION <u>FOR PARTIAL SUMMARY JUDGMENT</u>

I, PATRICK J. MCCOY, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

      1.    I am Chief Financial Officer for the Gateway Development Commission ("GDC") and have served in that role since April 16, 2024. In that role, I am in charge of the books and accounts of GDC, responsible for payments to and expenditures by GDC, and the performance of such other duties as may be assigned by the GDC Board of Commissioners or the Chief Executive Officer. I have custody of all funds and am responsible for investments of GDC, the deposit of all moneys, evidences of indebtedness and other value documents of GDC in the name and to the credit of GDC. I am authorized to sign financial instruments on behalf of GDC and am an authorized signatory for GDC with respect to any other documents incident to carrying out the Chief Financial Officer's responsibilities.

1

2. I submit this declaration to provide information concerning disbursements by the Department of Transportation ("DOT") of past due funds and the impact of those disbursements on the Hudson Tunnel Project ("HTP").

3. Since February 12, 2026, DOT, through the Federal Transit Administration, Federal Railroad Administration ("FRA") and Build America Bureau, has disbursed $205,275,357.69 in past due reimbursement payments. In addition, FRA disbursed $30,477,545.41 of the $49,778,756.92 that GDC had requested through its January 30, 2026 reimbursement submission, for which payments are due on March 2, 2026.

4. Because of these disbursements, GDC informed the contractors constructing the Palisades Tunnel Project, Hudson River Ground Stabilization Project, and Manhattan Tunnel Project that the suspension was lifted and work should resume. However, GDC issued letters to other professional service contractors limiting the work to be performed due to the uncertainty of continued funding.

5. Given this continuing uncertainty over whether the government will attempt to claw back the disbursed funds and whether it will honor its future payment obligations if the TRO is lifted, GDC has deferred the award of contracts for the P3 NJ Surface Alignment Project and the P1C Hudson River Tunnel Project which include major expenditures necessary to continue the project on its established schedule.

6. As a result of the work suspension that was in place between February 6, 2026 and February 22, 2026, GDC has incurred millions of dollars in additional costs.

7. GDC has outstanding January 2026 reimbursement requests for $18,880,269 that will be due on March 2, 2026. And at the end of February 2026, GDC will submit a reimbursement

request that will be due April 1, 2026.  GDC has no certainty as to whether those requests will be paid or whether DOT will breach again.

8.     If DOT clawed back the money disbursed to GDC or refused to honor the pending reimbursement requests, GDC would be forced to suspend the HTP again.  This would cost GDC further millions in costs and hundreds of workers their livelihoods.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on February 23, 2026.

Patrick J. McCoy

3